Filed 4/30/21  P. v. Pulidocolmenero CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071604 |
| v. | (Super.Ct.No. SWF1607111) |
| JORGE PULIDOCOLMENERO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Stephen J. Gallon, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

In December 2016, defendant and appellant Jorge Pulidocolmenero was hanging out at Gordon Guinn's house with friends.  They were drinking alcohol and using

1

methamphetamine throughout the night. In the early morning hours, defendant shot Guinn point blank in the head in front of the numerous people at the house.

Defendant was convicted of premeditated, deliberate and willful first degree murder (Pen. Code, § 187, subd. (a))[1] and personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Defendant was sentenced to 50 years to life to be served in state prison.[2]

Defendant claims on appeal that (1) he received ineffective assistance of counsel due to his counsel laboring under the misconception that pursuant to *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500] (*McCoy*) he had to pursue a defense of defendant's innocence at trial; (2) the trial court abused its discretion by denying defendant's *Marsden*[3] motion made prior to trial; (3) defendant received ineffective assistance of counsel based on his counsel failing to introduce expert testimony regarding defendant's long-term methamphetamine use and mental illness at trial; and (4) the trial court erred by imposing a $10,000 restitution fine and other fees at sentencing without conducting a hearing to determine his present ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). In supplemental briefing, defendant further contends there was insufficient evidence presented to support the murder of Guinn was premeditated, deliberate and willful to support his first degree murder conviction.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Additional fines and fees were imposed, which will be discussed *post*.

[3] *People v. Marsden* (1970) 2 Cal.3d 118, 123.)

2

# FACTUAL HISTORY

In December 2016, Gordon "Flash" Guinn had a house on Olson Street in Homeland. It was essentially a drug house at which numerous persons spent time, including Francisco; Nathaniel; Angela, who at the time was 17 years old; defendant; and Johnathan.[4] At the time, Guinn was depressed because his children were taken from him.

Casaundra was Guinn's girlfriend. They had moved together to Homeland in 2014. She lived with him in the house on Olson Avenue. She and Guinn used drugs together; numerous friends, including Nathaniel, Angela and Francisco, came to the house to use drugs with them. Casaundra and Guinn had children together, which were taken away because of their drug use. Just prior to Guinn's murder, Casaundra had moved out and was living with another man in order to get sober and to try to get her children back.

Nathaniel worked as an electrician but also sold drugs. He had been convicted in 2016 of selling methamphetamine. He hung out with Angela, Guinn, Francisco and defendant at Guinn's home in Homeland in 2016. They used a lot of drugs and Nathaniel would oftentimes provide the drugs. Nathaniel helped out Guinn financially on occasion.

On December 20, 2016, Casaundra had gone over to Guinn's house. Defendant was also present. Casaundra and Guinn were preparing for a court appearance the following day to try to get back their children. Guinn asked defendant to leave so they

---

[4] We refer to witnesses by their first names to preserve their anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

could talk. Defendant got upset that he was being asked to leave. Guinn had to open the door and essentially "kicked" defendant out of the house.

On December 21, 2016, Francisco arrived at Guinn's house around 8:00 p.m. Angela, Guinn, Casaundra, defendant and Nick were present at the house. Several persons were drinking alcohol. Angela was at the house looking for Nathaniel, who had money for her from selling drugs for her. Nathaniel arrived around 10:00 p.m.[5] They were all drinking and using methamphetamine.

Casaundra and Guinn were talking about getting back together. Casaundra and Guinn passed notes back and forth to each other about getting back together so that the others could not hear what they were talking about. Nick, Guinn and Angela were all near the couch in the living room and Francisco was sitting in a separate chair. Defendant was also at the house and was sitting on a paint can or bucket in front of the bathroom door. Everyone who was at the house that night was using methamphetamine.

Francisco and Nathaniel went outside during the evening. Francisco denied that they were fighting. They went back inside and everyone was sitting in the same place in the living room. No one was arguing and Francisco did not see any weapons. Francisco sat down at a different chair and started drinking a soda.

Defendant was sitting on the floor and then got up. Francisco heard a bang and thought it was a firework that they kept in the house. He looked up and defendant was holding a gun. Guinn was slumped over. Defendant pointed the gun at Francisco who

---

[5] Angela believed that Nathaniel did not arrive at Guinn's house until around 4:00 a.m. before Guinn was shot.

4

pleaded for him not to shoot. Nathaniel immediately approached defendant and asked what he had done. Defendant responded that he had not done anything. Defendant pointed the gun at Francisco. Angela was drawing when she heard a loud bang and also thought it was a firework. She looked up and saw defendant with a gun and Guinn was on the ground. Francisco and Angela both identified the gun as a .38-caliber revolver. Nathaniel asked defendant, "What the fuck are you doing?" This gave Francisco the chance to run out of the house. Angela left the house.

Casaundra did not see defendant shoot the gun but saw the gun in his hand. Casaundra was screaming and Nathaniel yelled at defendant "you just shot him." Nathaniel pushed defendant out the front door.

Casaundra got up and checked on Guinn. He was bleeding and groaning. Casaundra tried to find a phone to call an ambulance but could not find one. Francisco returned to Guinn's house. He saw Casaundra and told her to call an ambulance and to stay with Guinn. Francisco insisted that she told him she already called for an ambulance. Francisco drove back to his house, which was four or five blocks away.

When Nathaniel and defendant were outside, defendant pointed the gun at Nathaniel and told him to go back inside. Nathaniel did not comply. Nathaniel told defendant that he had just ruined his life by shooting Guinn. Defendant pointed the gun at Nathaniel demanding his truck keys. Nathaniel refused and told him he had to shoot him to get his truck. Nathaniel had an instinct that defendant would not shoot him. Nathaniel offered to drive defendant away from the scene. Defendant eventually just walked away to his house down the street.

5

Nathaniel went back inside and told Casaundra to lock herself in the bedroom in case defendant returned to the house. Casaundra complied and hid in the bedroom. Casaundra at this point called for an ambulance on Nick's cellular phone. Guinn was still alive. Casaundra told the dispatcher that her boyfriend had been shot but did not give the address to the dispatcher. She immediately hung up. Nathaniel went outside to make sure defendant was not coming back. He then drove Casaundra to a friend's house because she was afraid of the police. Nathaniel did not stay with Guinn because he was a convicted felon and would get in trouble. He spent the night at Francisco's house.

Francisco and Angela did not call the police or for an ambulance. Casaundra left before the police came to help Guinn because she thought everyone was going to try to pin the murder on her. She was also afraid that defendant would come back. She was dropped off a few doors down from Guinn's house and did not immediately hear sirens. Nathaniel never followed up to see if the ambulance arrived at Guinn's house.

Johnathan had received a call from Nathaniel around 1:00 a.m. that he should come to Guinn's house to party with them. He was with his girlfriend so he did not go over to the house until approximately 3:00 a.m. When he arrived, he did not see anyone and there were no cars parked in front. He went inside and found Guinn on the floor. Guinn was still breathing but blood was coming from his mouth and ear. Guinn did not have a cellular telephone so he ran across the street and borrowed a neighbor's phone and called 911.

Riverside County Sheriff's Department Deputy Jerrod Van Zanten was dispatched to Guinn's house at 3:12 a.m. on December 22, 2016. When he arrived, Guinn was lying

6

on the floor with significant blood around him and Johnathan was applying pressure to Guinn's head. Guinn was alive. Deputy Van Zanten called for an ambulance. Other officers and an ambulance arrived. Deputy Van Zanten was at the house until 11:00 a.m. the following morning and no other persons came by the residence. Guinn was taken to the hospital but died as a result of a gunshot wound to his head.

Defendant's house was searched. He lived only three houses from Guinn's house. A .38-caliber casing for a revolver was found in the home.

Riverside County Sheriff's Investigator Steven Paixao interviewed defendant around 10:00 p.m. on December 22, 2016. Prior to the interview, defendant was acting bizarrely. He "mess[ed]" with his handcuffs and was able to remove one. Defendant was given a bottle of water and he used it to wash off his hands. Investigator Paixao surmised it was an attempt to get rid of gunshot residue. Because it was raining and had been some time since the shooting, Investigator Paixao decided not to test defendant for gunshot residue.

Defendant was at Guinn's house the prior night around 6:00 or 7:00 p.m. There were five or six other people present but he denied knowing their names. He and Guinn smoked cigarettes and had some drinks. He then went home around 10:00 p.m. Defendant had heard that Guinn committed suicide. Investigator Paixao told defendant that Guinn had been murdered. Investigator Paixao told him that he had spoken with other people present and defendant's statement was not true. Defendant then told Investigator Paixao most of the first names of the persons present.

7

Defendant stated that a few nights prior to the shooting, he and Guinn had gotten into an argument because Guinn had asked him to leave his house because Guinn had a court appearance. They discussed the issue the night of the shooting and they were fine with each other.

Defendant denied that he shot Guinn and insisted he did not have a weapon that night. Investigator Paixao told him that the only rumors on the "street" were that defendant had shot Guinn. Defendant stated the rumors were not true. He did not shoot Guinn. Investigator Paixao told him they had evidence that he was the shooter and defendant asked him what evidence. Investigator Paixao told him he knew he was the shooter but wanted to know why he had shot Guinn. Defendant denied he was involved and asked why the Investigator was being so aggressive with him. He asked if he was being charged. Investigator Paixao surmised that defendant was upset that Guinn had disrespected him the night before. Defendant insisted that he was more mature than to shoot someone over such a disagreement. Defendant insisted he left before Guinn was shot.

Defendant brought up his mental health; Investigator Paixao indicated he knew nothing about any of his mental health issues. Investigator Paixao and the other interrogating officer told defendant they were sure he shot Guinn because he was identified by all the witnesses and they just wanted his side of the story. Defendant responded, "Then I guess it's me man." Investigator Paixao asked, "You guess it's you?" Defendant responded, "Yeah, it's me, I guess." Defendant told them he heard voices that told him all types of things but denied the voices told him to kill Guinn.

8

Defendant then said he never had a gun that night. Investigator Paixao encouraged defendant to tell him where the gun was located and what had happened. Defendant stated, "What are you trying to ask me? You're sitting here pretty much putting it in my mouth that I shot somebody. What else do you want man?

Defendant stated that he was sitting in the living room and suddenly everyone got upset with him and told him to leave. Guinn was shot but defendant did not admit to being the shooter. He then admitted he pointed a gun at Guinn. Defendant mentioned voices in his head but that he did not know what had happened. Defendant admitted he shot Guinn but did not know why he shot him. He denied it was because he was angry, disrespected or about him "being not okay in the head." No one convinced him to kill Guinn. Defendant mentioned Guinn being involved in a car crash that almost killed defendant's son. Defendant told the investigators the gun was not at his house but refused to tell them where it was. Investigator Paixao asked, "You can't tell me? Or you won't tell me? I'm asking that, I don't know." Defendant responded, "I'm not helping my case if I do. I don't understand man."

Investigator Paixao admitted at trial that persons in the criminal world did not like being seen talking to the police. Defendant never named Nathaniel. Nathaniel's house was never searched.

Investigator Paixao also spoke with Casaundra, who advised him that Nathaniel, Francisco, Nick, defendant, and Angela were present at Guinn's house. She stated that Nathaniel had told defendant that he owed Nathan $100. Defendant denied that he owed

9

the money but eventually paid it.**6** Paixao also spoke with Angela, who told him the shooting occurred around 2:00 a.m.

Johnathan told a sheriff's detective that Nathaniel was a new drug dealer in Homeland and that he had a lot of "haters" in the area because he was throwing around money and drugs to start his business. Johnathan did not know defendant. Casaundra testified Nathaniel asked her and the others not to divulge that Nathaniel was there that night because he was on parole. Nathaniel was convicted of selling drugs after Guinn's shooting. Angela heard rumors that Guinn was shot because of gangs, cartels and drugs. Several days after the incident Angela wanted to go to the police but Nathaniel was worried about talking to the police because they had heard there was a Mexican drug cartel involved. They did not go to the police.

Defendant waived his right to testify and presented no evidence on his behalf.

**DISCUSSION**

A.    <u>INEFFECTIVE ASSISTANCE OF COUNSEL:  MAINTAINING</u>

    <u>INNOCENCE</u>

Defendant appears to contend his conviction must be overturned based on ineffective assistance of counsel. He contends defense counsel erroneously believed that counsel had to maintain defendant's innocence at trial in reliance on *McCoy*, *supra*, 584 U.S. ___ [138 S. Ct. 1500] rather than pursuing a mental health defense. He insists that

---

**6** Casaundra's police interview was played for the jury but it was not reported. The transcript was not provided to this court.

10

such complete absence of counsel resulted in structural error requiring automatic reversal of his conviction.

1.  *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, defendant brought a *Marsden* motion to remove his counsel. During the hearing, defendant stated that he felt that counsel was not properly preparing for his trial, including not pursuing his mental health issues. Defense Counsel responded that he understood that defendant wanted to pursue a "full-on-I-am-one-hundred-percent-innocent-of-this-crime defense at trial" and counsel had discussed with defendant that this was a difficult defense based on him being seen shooting Guinn. Counsel acknowledged that he had records pertaining to defendant's mental health and was reviewing the records. As will be discussed in more detail, *post*, the motion was denied.

On May 15, 2018, defense counsel expressed a doubt as to defendant's competency to stand trial. Defense counsel noted he had met with defendant and he had reviewed defendant's records, which contained "over a thousand pages" of mental health records. Defense counsel noted he had not been on the case for a long time and just realized that it could be an issue. The trial court suspended proceedings pursuant to section 1368 and appointed two doctors, Patricia Kirkish and Robert Suiter, to evaluate defendant.

Dr. Kirkish did not find any objective, confirming evidence of defendant's self-professed psychiatric condition. Defendant did report a history of drug use. Defendant advised Dr. Suiter that he heard voices, including during the interview. Dr. Suiter believed that defendant suffered from some type of psychosis but that he was able to

11

understand the criminal proceedings and assist his attorney. He was mentally competent to stand trial.

On June 26, 2018, the trial court reviewed the reports finding defendant competent to stand trial. The parties waived a mental competency trial and the trial court, relying on the reports, found defendant competent to stand trial.

During discussion of the instructions, the prosecutor noted that the parties had discussed arguments pertaining to defendant's mental health off the record. The prosecutor noted that since the beginning of the case, the defense consistently stated that it was not pursuing a mental health defense. The trial court should not give any mental health instructions because of the conscious decision by the defense to not pursue this type of defense. Defendant's counsel responded that it was true they had not pursued a mental health defense but that he may argue defendant was not in the right state of mind during the police interview. The trial court would permit such argument. The parties agreed there would be no instructions about vitiating specific intent for murder due to mental defect or intoxication.

Defense counsel argued to the jury in closing argument that Nathaniel shot Guinn. Defendant did not have a motive to kill Guinn; Nathaniel had a motive in that he was supplying heroin and methamphetamine to Guinn. Nathaniel shot Guinn over a drug debt. Nathaniel had control over the group at the house by supplying drugs to them. None of the witnesses wanted to divulge that Nathaniel had been present. The police did not search Nathaniel's house; they would have found the murder weapon at his house. Nathaniel was a drug dealer who had a gun. The police should not have trusted anyone

12

who was at the house because they were all liars. Defendant confessed in the interview with police because he was worn down and he knew that all the witnesses "ganged" up on him. It was clear that defendant's mental health during the interview caused him to give up.

After defendant was convicted, at the time of sentencing, defendant's counsel argued that the trial court should strike the firearm enhancement because defendant's mental health issues and his drug problems warranted a lesser sentence. Defense counsel argued, "They were not pursued at trial. I didn't bring them to the Court's review. But as an officer of the court I can tell you that I have a stack of mental health records that simply wouldn't even fit in my briefcase. That he's been committed 5150 for various mental health issues. And drugs weren't just a hobby for him, they were a way of life that drastically reduced his ability to think clearly and to make good decisions. A statement that's also supported in his statement to the probation officer during his interview."

The prosecutor took issue with the argument about defendant's mental health. He argued, "Counsel now, potentially for some sort of appellate purposes, is raising the issues of potential mental health defense that was deferred. Again, I would invite any appellate court to review back to the preliminary motions where counsel expressly stated that they made a deliberate decision to pursue an it-wasn't-me defense rather than a mental health defense, because that is what the defendant alleged and that's what the defense chose to pursue."

Defendant's counsel responded, "[A]s to the issue of mental health. It was my impression that it would not succeed as a defense at trial. I don't know if a future appellate court would find me ineffective for that. [¶] But regardless of that determination, even if it's not a legal defense, certainly a person's mental health could be mitigating at sentencing."

The prosecutor responded, "I just want to confirm what was previously represented with regard to the defense was that—while counsel or anyone else may have chosen to explore a mental health defense—it was the defendant himself who wished to pursue the defense that he was not present. So counsel sort of potentially invited an effective claim there. But so it's clear, it is the defendant who had requested that defense, and that is what counsel felt obligated to pursue, is my understanding." Defendant's counsel noted that he could not disclose if it was defendant's decision on the record. Defendant's counsel did provide that, "I just—all I can say is all the strategic decisions were made by me. Once somebody says they're not guilty, I'm going to decide how to present the case based on consulting. But he doesn't—no client gets to run the show on exactly how we're going to present a defense."

2. *ANALYSIS*

" 'Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel.' " (*People v. Palmer* (2020) 49 Cal.App.5th 268, 279-280.) "To establish ineffective assistance of counsel, ' " 'a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard

14

of reasonableness . . . under prevailing professional norms." ' " ' [Citation.] ' "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) In addition, a defendant must show prejudice, that is, a reasonable probability that if counsel's performance was not deficient, he would have received a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.)

"When counsel overrides a defendant's autonomy on a fundamental decision that is reserved for the client, the defendant's Sixth Amendment rights are violated." (*People v. Palmer, supra,* 49 Cal.App.4th at p. 280.) " 'A violation of the client's right to maintain his or her defense of innocence implicates the client's autonomy (not counsel's effectiveness).' " (*Ibid.*)

Defendant claims that his counsel was ineffective because counsel erroneously believed that he had to maintain defendant's innocence at trial relying on *McCoy*, *supra*, 138 S.Ct. 1500. In *McCoy*, the defendant faced three counts of first degree murder and the prosecutor was seeking the death penalty. (*Id.* at pp. 1505-1506.) The defendant pleaded not guilty and insisted he was out of state at the time of the murders. (*Ibid.*) Prior to trial, the defendant's attorney advised the defendant that he planned to concede guilt because there was overwhelming evidence the defendant was the killer, and contesting his guilt at trial would make it nearly impossible to avoid the death penalty. The defendant instructed his attorney not to make the concession, but his attorney conceded the defendant's guilt. The defendant was found guilty of three counts of first degree murder and sentenced to death. (*Id.* at pp. 1506-1507.)

The United States Supreme Court reversed the defendant's convictions, finding, "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right 'to have the *Assistance* of Counsel for *his* defence' [*sic*] the Sixth Amendment so demands." (*McCoy*, *supra*, 138 S.Ct. at p. 1505.) The court also noted that when "a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest. (*Id.* at p. 1509.) However, when "[p]resented with express statements of the client's will to maintain innocence, . . . counsel may not steer the ship the other way." (*Ibid*.) The court determined "Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence . . . to McCoy's claim." (*Id.* at pp. 1510-1511.) The court found such "Sixth Amendment-secured autonomy" error was structural and reversed the judgment. (*Id.* at pp. 1511-1512.)

" '*McCoy* makes clear, however, that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear to *his counsel*, and counsel must override that objective by conceding guilt.' " (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1055.)

In *People v. Lopez* (2019) 31 Cal.App.5th 55 (*Lopez*), the defendant's counsel conceded during opening and closing argument that the defendant had committed one crime—hit and run—but was innocent of the charge of murder. (*Id.* at p. 62.) Nothing in the record reflected whether the defendant had agreed with the concession on the hit and

16

run charge. (*Ibid*.) On appeal, the defendant, relying on *McCoy*, argued that the court should apply "*McCoy*'s analysis of a defendant's constitutional right to control the objectives of his or her own defense to cases, such as this one, where the defendant has not expressly raised an objection." (*Id.* at p. 66.) The *Lopez* court found, "We conclude such an extension is not supported by the controlling authority." (*Id.* at p. 66.) The court further held, "we have found no authority, nor has appellant cited any, allowing extension of *McCoy's* holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense." (*Ibid*.)

In addition, the *Lopez* court found that "to the extent appellant contends his counsel's concessions constituted ineffective assistance of counsel, we are not persuaded. . . .' "[t]o the extent defendant is arguing that it is necessarily incompetence for an attorney to concede his or her client's guilt of murder . . . , the law is otherwise." ' " (*Lopez*, *supra*, 31 Cal.App.5th at p. 66.) It further found, "appellant cannot show that counsel's decision was outside the range of reasonable tactical decisions, particularly given the largely undisputed evidence as to the hit and run charge and the seriousness of the murder charge." (*Id.* at pp. 66-67.)

Defendant does not claim he is in the same situation as the defendant in *McCoy*, *supra*, where his right to maintain his defense of innocence implicated his autonomy. Rather, his claim is that he received ineffective assistance of counsel based on defendant not wanting to raise an innocence defense—but his counsel misunderstood the holding in *McCoy* believing that counsel had to maintain defendant's innocence at trial. The record in this case does not support defendant's claim. There is nothing in the record to support

17

that counsel was aware of the holding in *McCoy* and determined that he must maintain defendant's innocence at trial. Defendant's counsel made it clear that he had made a strategic decision to proceed to trial pointing to Nathaniel as the shooter. He insisted that he was making the strategic decisions and he was not relying on defendant for such strategic decisions. There is no evidence in the record to support that defendant's counsel erroneously relied on *McCoy* in determining the appropriate defense in the case.

Moreover, on this record, there is no evidence that defendant made it clear to his counsel that he must pursue such a defense of his innocence or even if he made it clear he wanted to pursue a mental health defense. In fact, defendant, during his *Marsden* hearing, as will be more fully explored, *post*, stated that he wanted his counsel to consider his mental health issues in his defense but did not express that it was the only defense in his case. That was not the case in *McCoy* where the defendant maintained his innocence while his attorney conceded the defendant's guilt. Further, there is no evidence that defendant adamantly disagreed with the defense put on by his counsel, to support that his counsel was ineffective by choosing to go against defendant's wishes. (*Lopez, supra,* 31 Cal.App.5th at pp. 66-67.) Defendant cannot, on this record, show his counsel erroneously relied on *McCoy* and has failed to show he received ineffective assistance of counsel.

B. *MARSDEN* MOTION

Defendant contends the trial court abused its discretion by denying his *Marsden* motion to remove his counsel. He insists that his counsel was providing inadequate representation by not pursuing his mental health defense and there was an irreconcilable

18

conflict between them in that he wanted to present a mental health defense and counsel wanted to present a complete innocence defense.

### 1.    *ADDITIONAL FACTUAL BACKGROUND*

As previously stated, on May 1, 2018, defendant brought a *Marsden* motion to remove his counsel.  The trial court asked defendant to explain how the relationship had broken down to the extent that his counsel could not effectively represent him. Defendant stated, "Well, he hasn't—he hasn't provided any—any, like—any, like, actual counsel to me other than telling me that I don't have a case, that, if I go to trial, I'm going to lose, and that I need to make a deal.  That's as far as, like, counsel I've gotten from him.  He hasn't taken into consideration any of the things that I brought up to his attention about my case, you know, like as far as, like, my mental-health issues, like, the condition I was in when, like, all this occurred.  So, like, I just don't feel like he's honestly, like, trying to help me, so I do believe there's a conflict of interest as far as that goes."

Defendant felt that counsel was not trying to get him a better deal or sufficiently preparing for trial.  Defendant insisted that counsel was not going through his file trying to find something to help him but rather continued to threaten that defendant could receive a sentence of 50 years to life.  Each time counsel visited defendant, he would just tell defendant the new offer from the district attorney, which kept increasing in years. The trial court noted that it was not his counsel's fault that the offer from the district attorney had increased.  Defendant recognized it was not counsel's fault but was concerned that his counsel was not putting any effort into his case or finding anything

19

that would help him in his case.  The trial court inquired if defendant had shared his thoughts with counsel.

Defendant responded, "I have.  I have.  And the only thing that has come from him is that, you know, my statement that I had given when I first got interrogated, you know, there was some things, like, I guess I said—I said, 'I did it,' you know.  And he's been— he's been stuck on that, and that's all he's taking into consideration, saying that since I already said that, being that I wasn't in the right state of mind, that that's the end of it pretty much."  The trial court asked, "Is he sort of giving his opinion that some of the defenses you may be giving to him to pursue are likely to fail because of that misstatement you gave to law enforcement?  Is that what he is saying?"  Defendant stated, "More like he's made—he's made me believe they are not even worth taking into consideration."

In response, defendant's counsel stated that he had been a public defender in Riverside County since 2002 and had done over 105 felony trials.  Defendant had been represented previously by another deputy public defender.  Counsel had been handling defendant's case for 90 days.  Counsel had reviewed defendant's file, which included mental health records, and spoke with defendant's prior counsel.  Counsel stated, "And also when I came on the case some of it was still being done in regard to witnesses and mental-health issues.  So I've definitely reviewed the case."  The trial court stated that it seemed defendant was suggesting counsel had not read his file and had not grasped the issues in the case to prepare a strategy to defend him.

Counsel responded, "His position—I could be misquoting him or misstating it. My understanding of his position is that he wants to go present a full-on-I-am-one-hundred-percent-innocent-of-this-crime defense at trial. And all of our meetings have been directed toward pointing out difficulties in that." Counsel had noted two difficulties in pursuing such a strategy, including that defendant had admitted doing it. It did not appear to counsel that this was a false confession. Further, there were witnesses to the shooting. Counsel had discussed these difficulties with defendant. Counsel did recognize that some of the witnesses were not trustworthy, but it would be difficult to overcome their statements.

The trial court noted that it appeared defendant and counsel had discussed strategy but did not agree on the best strategy. Defendant agreed but thought that counsel was not "necessarily taking into consideration" what he was trying to tell him. The trial court then noted that it appeared defendant was sharing his ideas with counsel and that counsel was giving his professional advice, which may not be what defendant wanted to hear.

Defendant understood that he may not get a better deal because of his statement. However, he stated, "But I try to—brought to his attention, you know, like I told him the story of what really happened, you know. Now that I've been in custody for a while. I've been clear-minded. I've taken my medication. I'm in a lot better state of mind than I was when it all happened. I can understand things a little better, but he just doesn't seem to, like, like—he's told me, like, I don't sound like I'm talking crazy on the tape when I gave the statement." The trial court responded that it seemed as though defendant

21

wanted counsel to "candy coat" it for him. Defendant disagreed, and stated he had sought out the advice of paid counsel and there may be ways to build up his defense.

The trial court then asked defendant if counsel had said anything that made him believe that if his case went to trial, that counsel would not defend him and just "roll over?" Defendant responded, "Not necessarily. But in a sense of him telling me that I should just make a deal or try to make an offer you know, to try to avoid going to trial . . . ." The trial court interrupted defendant and asked if this was the best advice. Defendant understood but did not think it was the right thing for him.

Counsel advised the trial court it was his advice that defendant take a deal. Defendant would take 15 years and the district attorney had countered with 15 years to life. This was not a bad deal for defendant. Counsel stated, "So if you can get down to a second-degree either through plea or if he were willing to put on a mental-health defense at trial, that could get it perhaps down to a second-degree, that fifteen to life would be, from my perspective, even having won some long shots, a good resolution on the case. [¶] The killing was with a gun and it was in front of, I believe six witnesses. And there was a confession. To work toward a parole hearing and not deny responsibility would be a good result if that's what he wanted, in my perspective."

Defendant then stated that his prior counsel was working getting him evaluated by a psychiatrist. When his new counsel was appointed, defendant mentioned the psychiatrist but counsel told him it was not necessary unless they wanted to try to build up a case on it.

The trial court ruled that it had taken into account defendant's concerns. The trial court felt that there were differences in their opinions as to the correct strategy. Ultimately, it was counsel who determined the strategy with the advice of defendant. The fact that counsel was telling defendant things defendant did not want to hear was not a reason to appoint new counsel. The trial court stated that despite counsel recommending that he take a deal, if defendant chose to reject the deal, the trial court believed counsel would fight vigorously for defendant. Counsel had appeared in other cases in front of the trial court and he did not hold anything back in defending his clients. The *Marsden* motion was denied.

2.    *ANALYSIS*

" ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 857, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181 fn. 2.)

"It is the very nature of a *Marsden* motion, at *whatever* stage it is made, that the trial court must determine whether counsel has been providing competent representation. Whenever the motion is made, the inquiry is forward-looking in the sense that counsel

23

would be substituted in order to provide effective assistance in the *future*. But the decision must always be based on what has happened in the *past*." (*People v. Smith* (1993) 6 Cal.4th 684, 694-695.)

"Denials of *Marsden* motions are reviewed under an abuse of discretion standard." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 (*Barnett*); *People v. Streeter* (2012) 54 Cal.4th 205, 230, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' " (*Barnett*, at p. 1085.)

Here, the trial court gave defendant ample opportunity to be heard. Defendant complained that defense counsel wanted him to enter a plea. He also complained that defense counsel was not considering his mental health defense. Defendant's counsel responded that he believed that defendant should take a plea deal due to witnesses being present and identifying him as the shooter. However, defendant's counsel also indicated he was in the process of reviewing the mental health records and that a mental health defense may help defendant if he chose to proceed to trial. Although there appeared to be some disagreement about how to proceed in the case, the record does not demonstrate a failure of counsel to "provide adequate representation." (*Barnett, supra,* 17 Cal.4th at p. 1086, fn. omitted.)

Defendant refers to the fact that counsel later raised a question as to defendant's competency but did not pursue a mental health defense evidencing defendant was provided inadequate representation to support granting the *Marsden* motion. The trial

24

court rules on the *Marsden* motion at the time it is brought, based on the facts before the court at the time. (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [the reviewing court in determining whether the trial court abused its discretion by denying a *Marsden* motion looks only to the challenged ruling and the facts upon which it was made], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) The fact that defendant's counsel later questioned defendant's competency and that a mental health defense was not pursued is not relevant to the denial of the *Marsden* motion. At the time of the motion, counsel stated that he was looking at defendant's mental health records and that it could possibly be a defense at trial. The fact that counsel also was advising defendant he should take a plea deal did not constitute inadequate representation.

The trial court further did not abuse its discretion by finding that no irreconcilable conflict existed between defendant and his counsel. In *Barnett, supra*, 17 Cal.4th 1044, trial counsel had only been recently appointed. The California Supreme Court found, "Since defendant had rejected [counsel's] assistance a mere 13 days after his appointment, at an early stage of the proceedings, the magistrate could reasonably conclude that defendant had not made sufficient efforts to resolve his differences with [counsel] or given [counsel] sufficient time to demonstrate he was worthy of defendant's trust. [Citation.] No abuse of discretion appears." (*Id.* at p. 1086, fn. omitted.)

Defendant's counsel had only recently been appointed. Defendant's counsel indicated that he was pursuing all avenues including a plea, an innocence defense, and reviewing defendant's mental health records. Defendant never expressed that he was

unable to work with defense counsel; he merely stated that he was concerned that counsel was not looking into his mental health defense. The record supports that defense counsel and defendant were still meeting and discussing defendant's case. The trial court did not abuse its discretion by denying defendant's request to substitute counsel finding both that defendant was not receiving inadequate representation, and had not shown that he and his counsel were embroiled in irreconcilable conflict.

C. <u>INEFFECTIVE ASSISTANCE OF COUNSEL: EXPERT TESTIMONY ON MENTAL ILLNESS</u>

Defendant contends his counsel was ineffective for failing to present expert testimony on defendant's mental health. As we have set forth *ante*, defendant brought a *Marsden* motion to remove defense counsel claiming that his counsel was not adequately investigating his mental health. Defense counsel assured the trial court that he was reviewing the mental health records. Counsel then raised a doubt as to defendant's competency and defendant was evaluated by two court-appointed psychiatrists. Both found him competent to stand trial. At the time of sentencing, counsel stated that he had volumes of mental health records that showed defendant suffered from mental illness and drug use, which warranted striking the firearm enhancement. Those records are not part of the record on appeal. The prosecutor objected arguing that no mental health defense had been pursued at trial. Defendant's counsel responded that it was a strategic decision not to pursue the mental health defense.

As stated, the standard of review for an ineffective assistance of counsel claim is well-settled. To establish a claim, a defendant must establish both that counsel's

26

representation fell below an objective standard of reasonableness; and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 686-688, 694-695.) In reviewing a claim of ineffective assistance of counsel, this court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury* (2003) 30 Cal.4th 342, 389, overruled on other grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901; see also *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1051.)

Defense counsel stated at sentencing that it was his strategic decision to pursue the defense that Nathaniel was the shooter rather than pursuing a mental health defense. This court does not have access to the mental health records possessed by defense counsel. Although there were evaluations to determine defendant's competency to stand trial, the records possessed by counsel were not presented in the trial court. At least one of the doctors expressed that she could not find objective evidence to support that defendant was suffering from a mental illness. Defense counsel reasonably could have concluded the records did not support that defendant was suffering from a mental illness when he shot Guinn, or that arguing that Nathaniel was the shooter presented a more plausible

27

defense. Nathaniel did ask the others not to identify him and it was clear he was their drug supplier. While there could have been a tactical reason to not call an expert to testify regarding defendant's mental illness, this court cannot assess whether such determination was reasonable without knowing what counsel reviewed in reaching his decision.

Moreover, based on the appellate record, it is not possible to determine if the admission of expert testimony would have resulted in a more favorable verdict for defendant because his mental health history is not before this court. While there is some evidence of defendants mental illness in the reports submitted by the doctors, in addressing whether he was competent to stand trial, it does not include any medical records or if he was suffering from a mental defect at the time of the shooting. Under these circumstances, the issue of ineffective assistance of counsel is more properly raised in a petition for writ of habeas corpus. (*People v. Mayfield* (1993) 5 Cal.4th 142, 188.) Defendant has failed to show on appeal that he received ineffective assistance of counsel.

D. <u>INSUFFICIENT EVIDENCE OF PREMEDITATION AND DELIBERATION</u>

Defendant contends insufficient evidence was presented to support that Guinn's murder was committed with premeditation and deliberation to support his first degree murder conviction. Defendant insists that he spontaneously shot Guinn based on defendant's mental illness and there was no evidence of planning or motive to kill Guinn.

When the sufficiency of evidence is challenged on appeal, we must review "the entire record in the light most favorable to the prosecution to determine whether it

contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Davis* (2009) 46 Cal.4th 539, 606.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) "Murder that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) " 'An intentional killing is premeditated and deliberate it if occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*Ibid.*) Deliberate means " ' " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

" ' "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Houston*, *supra*, 54 Cal.4th at p. 1216.)

"[E]vidence typically found sufficient to support [premeditation and deliberation] ' "falls into three basic categories: (1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)" ' " (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1024.)

Here, there was evidence of planning in that defendant arrived at Guinn's house with a loaded revolver. Possessing a loaded handgun can be evidence of planning. (*People v. Romero* (2008) 44 Cal.4th 386, 401 [bringing handgun into the store and shooting the clerk in the head showed evidence of planning].) Further, Casaundra provided that defendant had a motive for the killing. Casaundra indicated that the day prior to the shooting, she and Guinn had been at Guinn's house talking about a court appearance they had the following day. Defendant was with them at the house but Guinn asked defendant to leave so she and Guinn could speak privately. Defendant got angry

and Guinn "kicked [him] out." The jury could reasonably determine—as argued by the prosecutor—defendant was still upset that Guinn had kicked him out and decided to shoot Guinn because defendant was disrespected.

Moreover, the manner of the killing shows that defendant planned the killing. Defendant stood up while everyone sat around talking and using drugs and immediately shot Guinn point blank in the head. Defendant said nothing before the shooting and there was no evidence of an altercation. After the shooting, defendant tried to get Nathaniel's keys but eventually just left. Defendant did not seek to assist Guinn and did not acknowledge that he shot Guinn.

Defendant relies on *People v. Boatman* (2013) 221 Cal.App.4th 1253 (Boatman) to support his claim there was no evidence of premeditation and deliberation. In *Boatman*, the defendant pointed a loaded gun at his girlfriend and as a joke, cocked the hammer back. The hammer slipped and the gun fired. The defendant's girlfriend was shot in the face and later died. (*Id.* at pp. 1259-1260, 1263.) Immediately after the shooting the defendant contacted his brother and told him to call the police, and rendered aid to his girlfriend. (*Id.* at p. 1261.) Defendant insisted the shooting was accidental. (*Id.* at pp. 1259-1261.) The appellate court concluded there was insufficient evidence of premeditation and deliberation to support first degree murder based on the lack of evidence of planning, the lack of motive and the evidence that the shooting was accidental. (*Id.* at pp. 1267-1271.)

This case differs from *Boatman*. Here, defendant brought the loaded gun to Guinn's house, and there was evidence of a prior altercation between the two. Defendant

31

shot Guinn point blank in the head. He then pointed the gun at Nathaniel demanding his truck keys. When Nathaniel refused, defendant fled on foot to his house, rendering no aid to Guinn, who lay on the floor bleeding to death. There is no similarity between the facts in this case and the facts in *Boatman.*

Defendant states that he could not have committed the murder with premeditation because his mental illness prevented him from planning the murder. The only proper view of the shooting was that it was spontaneous caused by him suffering from a mental illness and his drug use. However, as set forth at length, *ante*, there was no evidence presented to the jury regarding defendant's mental illness at the time of the crime. Based on the evidence before the jury, it could reasonably conclude that the defendant committed the murder with premeditation and deliberation to support his first degree murder conviction.

### E.    ABILITY TO PAY FINES AND FEES

Defendant claims, relying on *Dueñas, supra,* 30 Cal.App.5th 1157, that the trial court violated his federal constitutional right to due process by failing to determine his ability to pay the restitution fine and fees imposed at sentencing. Defendant contends remand is necessary in order for the trial court to conduct an ability to pay hearing.

At the time of sentencing on November 2, 2018, the trial court imposed a criminal conviction assessment fee of $30 pursuant to Government Code section 70373; a court operations assessment fee in the amount of $40 pursuant to Penal Code section 1465.8; a restitution fine in the amount of $10,000 pursuant to Penal Code section 1202.4, subd. (b); and a $10,000 parole revocation fine pursuant to Penal Code section 1202.45, to be

stayed pending successful completion of parole. There was no objection by defendant's counsel and there was no determination as to whether defendant had the ability to pay the fines and fees.

The California Supreme Court will ultimately decide these issues of due process and excessive fines as it has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844 (rejecting *Dueñas* analysis with respect to restitution fines, which should be analyzed under excessive fines clause but following *Dueñas* as to court fees and assessments). For purposes of this appeal, we will not consider the merits of defendant's claim as we find that defendant waived any claim as to the restitution fine by failing to object and the record supports defendant has the ability to pay the fees imposed.

On January 8, 2019, after sentencing in this case, the Court of Appeal issued an opinion in *Dueñas*, *supra*, 30 Cal.App.5th 1157. In *Dueñas*, the defendant was a probationer who suffered from cerebral palsy, was indigent, homeless, and the mother of young children. She requested and received a full hearing on her ability to pay the court facilities fee, court operations fee, and the mandatory minimum restitution fine. Despite her clear inability to pay the fees and fine, the trial court mandatorily imposed them. (*Id.* at pp. 1162-1163.)

The appellate court held that the trial court violated defendant's right to due process under both the United States and California Constitutions by imposing court operations and facilities assessments pursuant to Government Code section 70373 and Penal Code section 1465.8, without making a determination as to the defendant's ability

to pay even though such determination was not required by the statute. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)

Initially, defendant has waived any objection to his ability to pay the restitution fine imposed. In *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154, the defendant was found to have forfeited the challenge to his restitution fine by not objecting to fines and assessments at sentencing in a case involving a restitution fine greater than the minimum restitution fine. Relying upon section 1202.4, subdivision (d), the *Frandsen* court concluded that, at least with respect to the restitution fine, defendant had forfeited that issue on appeal by failing to raise it in the trial court. (*Frandsen*, at p. 1154.) This court recently approved of this conclusion regarding the imposition of a restitution fine in an amount in excess of the minimum restitution fine. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1033 (*Jones*) ["Because, as noted, even before *Dueñas*, the Penal Code indicated that inability to pay may be considered in increasing the amount of the restitution fine above the $300 minimum, *Frandsen* was correct to conclude that '[s]uch an objection would not have been futile under governing law at the time of his sentencing hearing' "].)

Here, unlike the situation in *Dueñas* where the court imposed the minimum restitution fine, the trial court imposed a $10,000 restitution fine that was above the statutory minimum, without objection. Defendant at the time of sentencing had a statutory right to object to the fine as set forth in subdivision (d) of section 1202.4 but failed to do so. The California Supreme Court has found that if a defendant could have objected at the time of sentencing to a fine imposed based on inability to pay, such failure

to object waives the claim. (See *People v. Case* (2018) 5 Cal.5th 1, 53.) As such, we conclude defendant forfeited his inability-to-pay claim as to the restitution fine imposed pursuant to section 1202.4, subdivision (b), based on his failure to raise it below.

Defendant claims that if he is found to have forfeited his claim as to the restitution fine, he received ineffective assistance of counsel. However, on this record we cannot determine the reason counsel failed to object or prejudice. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 686-688, 694-695.) Counsel may have been aware that defendant did have the ability to pay the restitution fine. The probation report noted that defendant had been working as a roofer at the time of the shooting. Further, based on defendant's vicious crime, counsel could have considered an objection to be frivolous. Moreover, we cannot determine prejudice as it is possible that defendant had the ability to pay the fine out of his own funds and prison funds, as set forth, *ante*.

Moreover, even if *Dueñas* was correctly decided, and the trial court had to determine if defendant had the ability to pay the fees imposed, the record supports defendant has the ability to pay the fees based on his prison wages rendering any conceivable constitutional error harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *Jones*, *supra*, 36 Cal.App.5th at p. 1035.)

Defendant, who has received a sentence of 50 years to life can earn wages in prison to pay fees. "Wages in California prisons currently range from $12 to $56 a month." (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Even if defendant only made $12 each month, over 50 years, he would make over $7,000, which would be more than enough to pay the fees imposed. This is unlike the situation in *Dueñas* where the

35

defendant had no income and was disabled.  Defendant had been working as a roofer at the time of the murder.  We find that even if *Dueñas* was properly decided, any conceivable constitutional error was harmless.

## DISPOSITION

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
_____
                                                            Acting P. J.


We concur:


SLOUGH_____
                          J.


FIELDS_____
                          J.